Number 22-11141, Cameron Butler v. Charlene Smith. Mr. Wiggins. Thank you, Mr. Chairman. Kerry Wiggins, and I'm here with Craig Goodmark, counsel. Thank you for the opportunity to be here, by the way. We are here on a malicious prosecution appeal from both the state and the federal claims. This case is not a mother's worst nightmare, but it's up there. The Georgia child cruelty statutes are drafted in a way that allows wide latitude in parenting decisions. Some can be questionable, some can be terrible, but they are not criminal. Can I ask you one question before you dive into the merits of your argument? Sure. Is there any distinction between your 1983 malicious prosecution claim and your Georgia state law malicious prosecution claim for purposes of appeal? Well, the state... Or do we take them both together? Do they run together, or do they separate at some point analytically? Yes, Judge. The state, under Georgia's official immunity case law, there is a subjective component that's analyzed, and so that's where there is a slight variation. Under official immunity, under Georgia law, we think the sort of the retaliatory nature of Officer Smith's... But the district court didn't address that issue? No. Right. Okay. So for purposes... The district court addressed probable cause, and to a slightly lesser degree, maybe arguable probable cause, but didn't get into any of the other elements. So I guess my question to you is, for purposes of our appeal, we treat both of those claims the same with regard to the probable cause element? Is that right? Right. If there was probable cause, it defeats both claims, right? I would concede that. Thank you. Go right ahead. And so Officer Smith, on this record, in her deposition, was candid that she's unfamiliar with how to go about investigating a child neglect or a child abuse case. She doesn't have any experience in doing that. And let me say this, as long as we're talking big picture. This is not... This court knows this case a lot better than I do, but this is not a DUI road stop. This is not a domestic violence call. This isn't a situation where an officer is going to have to make an on-the-scene judgment, assign credibility, and this, that, and the other. This is a dysfunctional family-type issue. It's a child abuse charge. Officer Smith, before she took these warrants out, did not, even though she admittedly didn't know how to investigate this type of crime, she did not go to the district attorney, for example, and ask for a review or a consult on whether the charges were good. And for that reason, she drafted two plainly incompetent arrest warrants. And so we have two real challenges. We have a facial challenge to the arrest warrants, and then we have the Franks v. Delaware, sort of a sub-facial challenge, if you will. Facially, the subsection A warrant, which addresses sustenance and food deprivation, on its face, it doesn't even, it doesn't mention food or hunger or anything. Can I ask you a quick question about the warrants, just sort of blocking and tackling? Because there are two crimes, are they, just remind me about the record, are they in a single warrant application? Can we consider things said with respect to sub-C for purposes of sub-A and things said for sub-A with respect to sub-C? Can we sort of mix and match factual allegations or not? The way I read this Court's case law is that you look at the four corners of the warrant application and the warrant itself, and you see if it supports the crime alleged. I understand that the subsection E. Just help me with the record. Embarrassing that I, if I, if I had forgotten this, but there's one warrant application or two? There are two. Two separate warrant applications. Got it. Two separate warrant applications. Submitted at the same time or no? Submitted at the same time. Same judge, same time. Because there are two different warrant applications, you can't take facts alleged as to C and apply them to A or facts alleged as to A and apply them to C? I'm just saying having read this Court's case law, it doesn't seem to suggest you can cross-reference and hop around. Gotcha. And I don't know, but I'll defer to the Court on if you can cross-reference. No, I'm just not, I'm not sure actually. That's totally fine. But it's easy for me, it's easier for me to talk about them separately because of the way they were drafted. But the subsection A warrant affidavit, it's, it just, it's talking about Ms. Butler not picking up her son from school one day, on a particular day, September 25th, I believe. It just, it doesn't mention anything about sustenance and I think in our brief we were pretty clear about what it takes under Georgia common law, certainly in the statute, to reach that type of crime. The subsection C, which deals with cruel or excessive physical or mental pain, that's the one that it seems that the District Courts seem to latch onto the most. But that too, on its face, does not come close to alleging a crime, not a child neglect crime under the Georgia statute. Can I ask you a quick question? So before we even get into sort of like the, the sort of the hideousness of the treatment, whether it sort of meets these criminal elements, both statutes require sort of act, I guess, some action. It's like the first one, sub A requires depriving the child of something. Sub C requires causing the child to suffer something. Didn't, and this is a softball, I guess, I'll ask your adversary as well, but didn't Smith know, by virtue of the call, that this was Jayden's choice? His mother had presented him with a choice. He could go to the zoned school with BUS or the non-zoned school without. And so I'm having a hard time, even before we get into the common law, about like how horrible this stuff might be, why she deprived or caused him anything. His mom, I mean. I fully agree. No, there's no willful deprivation as that's a term of art, phrase of art in the law. And there's no causation under the subsection C. If you look at it closely, subsection C, for example, she had to have caused cruel or excessive physical or mental pain. She was anything but cruel. And Officer Smith knew that. She was accommodating her son. She wasn't putting him in a wooden box because he painted on the wall. She was letting him go to his chosen school. So that's not cruel. Whether it was excessive, no, it wasn't excessive. And more the point, there was no pain. There's no pain alleged in the subsection C. There, ostensibly, I guess in Charlotte or Charlene Smith's mind, there was a risk of pain if you stay out in the sun and you don't get water and you have a heart condition, which of course we contend was a falsehood. But there was no pain. And the statute is, if we're looking at the statute, it's talking about actual causation of pain. So those are the, you know, we think that under this court's, under Luke v. Deli too, and a lot of cases examining facial validity of arrest warrants, we think this is not up to snuff. Getting into Franks v. Delaware, the warrant, we contend, I'm focused on the subsection C in particular, contains a number of false statements. Number one, she doesn't leave her son, who's almost 18, she does not leave him at school. He can walk home. It's really not Jayden being left at school, it's Jayden not leaving the school. When, when Officer Smith called up Ms. Butler at work and said, you need to come get him, Ms. Butler's like, let him, tell him to go to the park, tell him to walk home. I'm not going to, I can't, I'm at a job. I don't get off until 5 o'clock, I work in Decatur, I can, you know, my deal is, I drive him off, I drop him off in the morning, and I pick him up when I come home. So that's a lie. 7 o'clock, no, he wasn't staying up there until 7 o'clock. But on that, on that one allegation, isn't that immaterial? Like, it doesn't really matter for probable cause purposes, whether it's 6 o'clock, or 6.15, or 6.30, or 6.45, or 7, right? Well, Judge, I think the whole, again, going back to the facial, I think none of it matters. I know that. But I understand, I don't, I think these are false, there's nothing else in the warrant. It's, it's, it's three things. She leaves her son at the school, he's there from 3.05 to 7 p.m., and he has a heart condition. The heart condition is an outright falsehood, at the very least, recklessly put in there. She was never told he had a heart condition, she doesn't know what it is, it turns out he doesn't have a heart condition. So that's false. Well, you said she was never told, but she got the information from him, or from somewhere else, right? Sometimes wearing the heart monitor. Right, the heart monitor, correct. She got that from somewhere. She did, I mean, it's in the warrant. But he, he did not, she said he did not tell her that, so we're talking, already we're talking about rumors and supposition on, on Officer Smith's part to put it in there. But, you know, to put down that someone has a heart condition, and they can't stay in the sun or go without water, that is, I think it's a fabrication, but it's certainly reckless, and reckless under Kelly v. Curtis. So, counsel, you dispute as well that he ever wore a heart monitor? Do I dispute that he ever wore one? Yes. No, Judge. He did wear, there were, I think, disputes whether he wore one more than twice, but he Well, counsel, they don't, first of all, you have to have a prescription. They don't prescribe heart monitors for ankle injuries. They just prescribe them for, to keep track of trachardia or atrial fibrillation or something like that. So how can you say, yes, he wore a heart monitor on at least two occasions, maybe more, maybe not more, but he didn't have a heart condition? Judge, respectfully, wearing a heart monitor is a means to diagnose a potential heart issue. It can absolutely rule out that there's any organic heart issue, and that's what happened with Jayden. And so, That's, counsel, that is one purpose of it. Another purpose of it is to monitor a heart condition and see if it's recurring or how bad it is. That's true. That's true. But again, that goes to the lack of investigation, the complete supposition on Officer Smith's part that he had a heart condition. And on top of that, that staying after school for a couple hours would exacerbate the heart condition. That's really the, I don't know, the second round of recklessness when it comes to the heart. Well, the heart monitor being no big deal is, I understand your position. That goes only to the Franks issue, right? Or wrong? Well, no, I think... The issue is, the Franks issue is, did she lie or recklessly state that he wore a heart monitor when, in fact, he didn't? Well, the Franks issue is that she's saying that he had a heart condition, number one, and that's not true. And that the heart condition was exacerbated by staying after the last bell for 90 minutes or whatever. That's not true either. So, those are both reckless statements. I see him out of time. See, I'm... Counsel, I have a problem with that, and this is not your whole case, I understand that. But I have a problem with saying that someone who's worn... It's reckless to infer that someone who has worn a heart monitor on multiple occasions, whether it's two or more than two, it's reckless to infer that they have a heart problem. And that's your position, isn't it? Well, yes, Judge. I think when you're taking out a warrant and accusing a parent of child abuse and that's all you've got, and you didn't do anything to even come close to confirming it, and again, this is supposition, I don't think it's a reasonable inference to say that a strapping young man, almost 18 years old, in good health, has a heart condition. I think that's the exception, not the rule, when you're wearing a heart monitor at 17 years old. Let me ask you a question. Do you need to die in the ditch over the heart monitor or, I mean, I guess the more problematic piece of this case to me is not so much what's in the warrant, but what's not in the warrant, or application rather. And I just don't understand how the omission of the fact that this was, that the mother had given Jayden the choice of which school to go to and the other choice would have remedied every single problem that exists in this case, how that could plausibly be left out of this warrant application. Again, our briefs cover it, I'm not leaving anything out of the brief, but the omissions are staggering. How far is it to walk from the school to his home? That's not in the, that's not in the warrant. His age isn't in the warrant. I understand Smith said that she verbally told the magistrate that. No history of Jayden's history in the courts, the chin system, the juvenile court system, and the bending over backwards that Ms. Butler was doing to let Jayden do what he wanted to do, and he could have gone to the park and played basketball with friends and all that. So this case doesn't rise or fall on the heart question. I just, I guess I might have a slight disagreement with the court. I think it's complete supposition and absolutely irresponsible for her to go to a magistrate or a judge and say that Jayden had a heart condition. So I reserve the rest of my time. Thank you. Thank you very much. Ms. Clay. May it please the court. My name is Frances Clay. I'm here representing Charlene Smith, who is the defendant appellee in this case. And I do take issue with some of the facts that he was, that Mr. Wiggins was stating from the record because I think that they are a little bit inaccurate. He asked Defendant Smith if she had ever sworn out charges for cruelty to children before, and she said yes, not just in this case. She said she has done that before in her role as a city of Conyers police officer. He asked her, does she know how DFAX investigates a case, and she said no. She doesn't know what DFAX does. She's not a member of DFAX. She's a Conyers police officer. She knows what she does. So she did have some experience with cruelty to children cases in the past. Can I ask you just to address the problem that I'm sure you can tell is really bothering me, which is, so is it a fact that the mother had given Jayden the choice of which school to go to? Okay. And we'll just kind of walk through it. But is that, I promise I'll let you explain, but is that true? She had given him the choice. Sort of. Yes. He, she said, you know, we're moving outside the school district. You've been at the school for three years. He wanted to stay, and she said fine. But she's still the parent, and it's her responsibility to make sure that he has a way home from school. She had to sign paperwork with the school that says children are not allowed on campus after last bell unless they're in a supervised activity. Well, so let me, let me just sort of finish my cascade, and then you can respond to all of it. Here's what's troubling me. The mother had given him the choice. Jayden, we're moving. You have, you have a choice here. Either come to the zone school where you'll have bus transportation or stay in the school where you are here. And frankly, implicitly, it's going to be tougher. Smith knew that because I've watched the call, you know, the call where Jayden is sitting across the desk, and Smith is recording herself on the phone with the mother, and the mother told her, here's our story. Here's our family story. We moved. I gave Jayden the choice. So at that point, how is it even arguable that the mother is depriving Jayden of anything or causing him to suffer anything within the meaning of the statute? I think that it's, that she's depriving him and causing him to suffer within the meaning of the statute because she, she gave him the choice. She says leave the bus. Well, then she has to live up to her end of the choice, which is find a way to care for your child and get him home. She's not leaving. She's leaving him on campus where he could be arrested. She has done that. She has said, the solution to our problem is to go to the zone school where you have bus transportation. She has, she has provided a solution, like the solution. That was the solution before he entered the school. After he entered the school, and she said, okay, we're going to let you go to Rottnell County. She said, the solution is you have to wait on campus for me, illegally, where you could be charged for trespass. You have no access to water. You have no access to food. Did she tell him that he absolutely had to stay at school, or did she say, you have some options. You cannot go to the forbidden apartment complex. Right. She told him, you can stay at school. You can walk home. You can go to the park. You stay at school. You can go to Pine Lodge Park, which is the most dangerous park in the city of Conyers. There is testimony from various different officers. There's gang activity. There are rapes. There's drug activity. All right. He still would have no access to water. He still would be out in the heat with a heart condition that she believed he had because he had the Holter monitor, and she had seen paperwork about him needing some sort of procedure. All right. Or he could walk home. The walk home, he gets home, she's not going to let him into the apartment. That he could sit in the leasing office, the business office, so to speak. I'm not sure that the lease, I think there was testimony that the leasing office did not stay open until 9 o'clock, and she was not getting home until 8 or 9 o'clock. I mean, I'm not trying to ascribe this knowledge to Officer Smith. But the reason she wasn't giving the leasing office the ability to give him a key was because on occasions he had skipped school, gone in, gone out of school in the morning, walked over to the leasing office, asked the people there for a key. They knew that he was the child who lived there. So they gave him the key, and then he would stay home. And then before the mother got home, he would give the key back. Well, and let me just say, asking for a key after school hours is different from asking for a key during school hours. And after school hours, she would not let him have a key to get into the apartment. Did Smith know about this key issue, that he had abused key privileges before? She didn't know he had abused privileges. She only knew that she had driven him home twice, taken him to the leasing office where he got a key, and then he came back into school and he said, my mother has told the leasing office I can't have a key anymore. So my recollection, you can tell me if this is wrong, but I watched the call, and I think that she was told by the mother that he couldn't have a key because, quote, he was having people in the house and skipping school. Right. But Smith knew that. That is during the day. When Smith took him home, we're talking after school hours, and she won't let him into the apartment. He's having to stay outside his apartment until 8 or 9 o'clock at night. I can understand that she doesn't want him skipping school during the day. Wait, wait, wait. Where do you get this 8 or 9 o'clock at night thing? Because that's what Jayden told Smith. He has a statement that he filled out. He said, I'm having to stay home until 8 or 9 o'clock. He had called her before. But if the mother picked him up at 7, how would he stay out until 8 or 9? If she picked him up from school, she picked him up at 7. But if he walked... Wasn't that the allegation that she didn't pick him up until 7, 3 or 5 to 7? But if he went home, then she sometimes wouldn't get home until later than that. And that's what he had told her as well. And that was in the warrant application? It's not in the warrant application. That was knowledge that she had. So, you know, can we consider things that were just in her mind that she did not put in the warrant application? Aren't we limited to things on our case law, I think? This Williams case, right, written a couple of years ago, says that in a malicious prosecution case you're stuck with what's in the warrant and then what's not in... What should have been in the warrant, not what's in the officer's head. It's not a false arrest. Well, and also anything that the magistrate judge might have asked when he was issuing the warrant. Right. Fair enough. Okay. And I know that he asked about the age. You know, she told him what the age was. The record is unclear as to what else the magistrate judge might have asked her. But in the warrant itself, I think there is sufficient information to establish probable cause or at least arguable probable cause, which is not the same standard that is necessary for conviction of a criminal charge, which is what Mr. Wiggins is trying to argue. In this affidavit, and I will say that both of their separate affidavits, but they were presented together at the same time, so the information was there. Did she confuse Section A and Section C? Perhaps. Is that an indicator of reckless intent? No. The information that she put in there was information based on her firsthand knowledge or information she had gotten from the victim or from her fellow officers who also were aware of the situation and what was going on. She knows that... What sustenance was he deprived of? Well, he did not have access to water. Once the school doors are locked, there are no outdoor water fountains or anything like that, okay? So he has no access to water. Can I ask a dumb question? Yes. What about a water bottle? True, but he'd had no money because he told them he had no money, so he couldn't buy water. They would have to give him food and water from the SRO's office on multiple occasions. Could he not have filled up a water bottle in the morning before he went to school? At what point do we just exercise some common sense and say, this is an 18-year-old kid? Right. I think things would be different if you were talking about a 6-year-old, right? That's a different story. A 6-year-old is not able to function in the same way that a 17-year-old is. True. But this 17-year-old who supposedly has a heart condition, as far as she knows, he has a heart condition. He even testified that he did have a procedure, even though his mother denies it. But when she knows that this 17-year-old comes into the office, tells them he's hungry, the day that she called the mother, the 27th, that morning, he says, she didn't pick me up at all. I had to stay at a friend's house. I have not eaten since lunch the day before. And he hadn't bathed or anything like that. So the SRO's are having to give him money, give him food, give him deodorant so that he can get through the day. They call DFAX. You're suggesting that the bathing and the deodorizing rise to the level of either of these crimes, are you? That's off the table, right? No. No, it's just more evidence of the totality of the neglect that he's having to, he's having no care from his mother whatsoever. The crimes alleged are very serious crimes, right? Especially when you read the case law that Georgia courts have attached to these crimes. These are very serious matters. And so, you know, I think Judge Jordan is, you know, he's asking about the really important stuff about, like, sustenance. Well, if someone has a heart condition and they are left out, and you know what the heat is in August and early September in Georgia, they're left out in the heat for multiple hours without access to water or food. And he's having to walk home, either cross over the interstate or, you know, walk home three miles through the busiest intersection, one of the busiest intersections in the city. And then when he gets home, he can't even get into the apartment because the mother won't allow him a key to get in after hours and, like, after school hours. He has to sit there. I think that there was enough for probable cause or at least arguable probable cause to believe that she had committed a crime. And things were escalating. I mean, they had talked to the mother on the 27th and said, look, what you're doing, the totality of what you're doing amounts to cruelty to children. And instead of taking measures to try to correct things, she refuses to come meet with them. And then that night, refuses to come pick her son up again. So things were escalating. Not only that, but then she gets home, he gets home, and the mother's boyfriend tries to provoke him into a fight and starts cursing at him. Can I ask you a question about, you know, we were talking about food earlier in response to one of Judge Jordan's questions. Didn't Smith likewise know that Jaden was eating at school because they ate together? And didn't she also know that he was actually trying to lose weight for wrestling? And if she's going to allege a crime that is about the deprivation of, like, life-sustaining sustenance, don't you think that was something she should have told the magistrate? Oh, by the way, I know he eats healthy lunches at school, and I know he's trying to cut weight for wrestling. But in any event, this is first-degree child cruelty. I think that what she put in there was sufficient. Well, but I guess I'm not asking so much about what she put in there, I'm asking about what she left out. She did not put in there. Okay, what she did not put in there. Well, you know, I wish that she had put in a little bit more. Yeah, I do. But you don't wish she had put that in, right? Because if she had put that in, that detracts from your case. By the way, I know he eats really healthy lunches at school, and is trying to cut weight for wrestling. But in any event, he's being deprived of life-sustaining sustenance. I don't know that she knew he was trying to lose weight for wrestling. I think that was Officer Quick, who had had the wrestling discussions with him. She knew that he would come in and say he was hungry. Like, I haven't eaten since lunch yesterday. I have no money. I can't get any food. That was what she knew about. Yes, he sometimes did come in there and eat lunch, but sometimes he didn't have food, and the SROs had to provide him with food. One of the SROs had even had to give him a freezer full of food, because he said they didn't have food at home at one point. So when he comes in and he says, I don't have food. I haven't eaten since yesterday. You know, my mother wouldn't come pick me up. I had no way home. Does Georgia have child neglect criminal statutes? I wish that I knew the answer to that. I don't do criminal law, and I've only looked at the statute that was at issue here. Under some statutory regime, I can see at least arguable probable cause for violation of a neglect statute. Sort of a negligence standard. You weren't taking care of your children the way you should. This is dangerous. Don't do it again. That sort of stuff. But these are cruelty statutes. Well, I do think... Where is the... We've talked about the sustenance part of it, of subsection A, but in subsection C, where is the cruel or excessive physical or mental pain? I think the cruel or excessive pain is in knowing that, or his not knowing, how am I going to get home? Am I going to get home today? Am I going to have anything to eat today? Am I going to have anything to drink? What's going to happen to me today? If I get home, what time am I going to get inside? Is my mother's boyfriend going to beat me? Is he going to try to get me into a fight? What's going to happen to me? You know, there are, unfortunately, a lot of places in America where parents have to make incredibly difficult decisions because they just don't have the money or the resources to do everything they would like for their children. And I'm not from Georgia, so I don't know Georgia background, and I can't sort of give you an instinctive reaction, but I'm not sure that this statute is meant to target those parents who are doing the best they can, but can't do the best that society hopes for. There are a lot of kids in America who get one square meal a day, maybe one and a half, because they just can't provide any more. And if this statute is meant to get at that as opposed to a child neglect statute, wow. I'm not sure that this officer could be held to the level to understand exactly what this is. There's arguable probable cause. Well, she has to have some belief or understanding of what cruel or excessive physical or mental pain is. She has to have some idea of what it means to deprive a child of sustenance. And I think she did. Because if not, she wouldn't have charged her. And I think based on her knowledge and her belief in what that was, that's why she brought the charges, because the child was being left with no way home, where he could be charged with a crime, for one thing. He had no access to water, no access to food, no idea when he was getting home. If he went home on his own, he'd have to go through dangerous intersections in the heat still. When he got home, he didn't know if he'd be let into his house, what time he'd be let into his house, or what he would face when he got to his house. So I think that, you know, this is the warrant. You make the arrest, and then you can, you know, find more evidence, if necessary, to prosecute. Let the court sort it all out. Arrest and let the court sort it all out. Is that what you're saying? No, I don't think that. I think that this was an initial step, and then there's more investigation involved. Lots of times a warrant is taken out, and then there is more investigation involved. Can I ask you just a record question, and I can ask the other side as well? But I listened to the call as well between Jayden and his mom that night. He says two things in there that just sort of disturbed me a little bit, and I'm wondering if there was any discovery done about what he might have meant. At one point he says, this only makes things worse, Mom. When she says, I'm not, like, you went to the forbidden apartment complex, I'm not coming to get you there, right? Some version of that. He says, this only makes things worse, and then the very last thing he says to her before he hangs up is, that's all I needed you to say. Was there any discovery done about what he meant by that? And I'll just confess, it feels a little set-up-ish to me. I don't think there was discovery, but Smith didn't know that he was going to be recording this conversation. But Jayden was present when Smith made the call to his mother. So maybe just from his own listening, he thought, well, this is what I need. But he was present when she made the phone call. Okay. All right. Thank you very much. Thank you. Judge Newsom, I agree with you. The call very much has that flavor. We, that might have been my shortcoming because I did take the deposition of Jayden, and I did not follow up on that line of questioning, and I didn't like the answers I was getting, and maybe I got frustrated. Counsel, let me, let me ask you something. You agree that we consider what's in the warrant and anything else that the applicant may have told the magistrate judge, so far as we can tell from the record, whether it's in the warrant or not, correct? If I understood you correctly, Judge, I think you can only look at what's in the warrant application and what's in the record as having been explained to the magistrate, but nothing else. All right. Told to the magistrate. I'm not sure explanation is what I'm talking about. If she had, if the magistrate judge had said, well, is there any danger from drugs involved in this? And she said, oh, yes, that housing project, and she named it, it's got a drug dealer over there, and I've told him not to go, not to go, not to go. The Smith had told him that, not the mother. And, you know, the magistrate judge can consider that, right? Well, the Williams case from this court, and Luke v. Gulley, and hearkening back to the Whiteley v. Warden, U.S. Supreme Court in 1971, they all suggest that the application, the warrant is what you're looking at, but some seem to say that if there's record evidence of the magistrate being orally told, then that could be considered. Right. Our tone in writing, I mean, if the mother had gotten there and said, on the way up here today, in addition to my application, I jotted down another couple of things, and here it is, and handed it to her, handed it to the magistrate judge, he or she. That would be considered, wouldn't it, as long as it's in the record? It's in the, if it's in the record as having been submitted to the magistrate. At the time he issued the warrant, right. You can't come in three days later, et cetera. All right. Let me ask you this. Weren't these warrants obtained simultaneously? I apologize. I didn't catch the last part of that question. Weren't these two warrants? Yes, they were. They were. They were. Okay. So, what she put in one warrant was before the magistrate judge when he issued both warrants, right? Yes. And that's what I was saying earlier. Okay. So, this is one of those rare occasions, or I don't know if they're rare or not, occasions in which what's in one warrant could be considered to support the allegations and the application in another warrant, and vice versa, because the magistrate judge was told those when he issued both warrants, right? Yes. I'm not disputing that both warrants were before the magistrate at the same time, and they had what was written in them before the magistrate, so I... And what I'm asking you about is, because I'm giving you an opportunity to argue against my inclination about that, that part of the case, is if it was before the magistrate judge in writing, how is that less relevant and less supportive of the warrant than something she just had told him, Smith had told him, if Smith had told him something? I mean, we have it right there, black and white, on paper. He can consider it, can he not, as to both warrants? Judge, honestly, I don't know the answer to that other than to say that the case law says you look at the warrant application to the charge that's being assessed or alleged in the warrant application. And so, you're asking me, can you cross-reference? I don't read the case law as allowing that, but I'm not here to die on that hill this morning. Yeah, maybe that's something that needs some more research, but I'm just not sure that the sweeping statements, you only look at the application. Those have been made in cases in which there were multiple warrants based on multiple applications submitted to the issuing magistrate at the same time. But I won't go into it further. I see I've over my time, can I just... You can wrap up. Okay. Just really quickly, I think you nailed it. This is a 17, almost 18-year-old man, a water bottle in a backpack and a smartphone, he'd be just fine out there at the school as he was. He manipulated his mother, he could, you know, the city is, excuse me, Officer Smith through the city is arguing our parks are bad, our intersections are bad, everything's bad. Remember, Officer Smith gave Jayden a bike. Her daughter and Officer Smith gave Jayden a bike, he could have biked home, 13-minute bike ride, that's on Google Maps, you could take judicial notice of that. You know, Cameron Butler's a single mother, three children, one of which was nine at the time, working herself silly, and for this case, it criminalizes her parenting efforts. It's just absolutely wrong, and Judge Jordan, you put your finger on it, this is a child cruelty statute, it's not simple neglect or lack of supervision. She just, absolutely wrong. I don't have anything else to say. Thank you. Thank you both very much. We're in recess for today.